1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10  JOSHUA PLASCENCIA,              )  CASE NO. CV 12-8102-PJW
                                    )
11               Petitioner,        )
                                    )
                                    )  MEMORANDUM OPINION AND ORDER
12          v.                      )  DENYING HABEAS CORPUS PETITION
                                    )
13  DOMINGO URIBE, JR.,             )
                                    )
14               Respondent.        )
    _____)

15

16                              I.

17                         INTRODUCTION

18       Before the Court is a Petition for a Writ of Habeas Corpus in

19  which Petitioner claims that he was denied a fair trial when the trial

20  court denied his motion to sever his trial from the co-defendant's

21  trial and when it failed to instruct the jury on a lesser included

22  offense.  (Petition at 5-6.)  Petitioner also claims that there was

23  insufficient evidence to support his conviction for kidnapping for

24  ransom.  (Petition at 5.)  For the reasons set forth below, the

25  Petition is denied.

26

27

28

II.

SUMMARY OF PROCEEDINGS

In April 2009, Petitioner was found guilty of kidnapping for ransom by a jury in Los Angeles County Superior Court. (Clerk's Transcript ("CT") 457.) The jury also found that co-defendant Gabriel Partida had used a firearm in the kidnapping. (Supplemental Clerk's Transcript ("SCT") at 102.) Petitioner was sentenced to life in prison without parole. (CT 492-93.)

Petitioner appealed to the California Court of Appeal, which affirmed the judgment in a written decision. (Lodgment Nos. 3, 8.) He then sought review in the California Supreme Court, which was summarily denied. (Lodgment Nos. 9, 10.) On September 19, 2012, Petitioner, proceeding pro se, filed the instant Petition.

III.

STATEMENT OF FACTS

The following statement of facts was taken verbatim from the state appellate court decision affirming Petitioner's conviction on direct appeal:

> *The abduction*
>
> In 2005 Marvin Reyes and his wife, Maritza Navarro, owned a beauty salon on Olympic Boulevard in Los Angeles. They were at the salon the afternoon of March 23, 2005. Navarro's sister, Petrona Navarro was also present.
>
> At about 1:30 p.m., two men with shaved heads passed by the salon and stopped to look at a sign on the door that said, "Cosmetologist wanted, ask for Maritza." About 10 minutes later, the men entered the salon. One man remained near the door, with the hood of his sweatshirt up and his

2

hands in his pockets.  The other man, who had tattoos on his neck, one of which read, "Watts up," came into the shop and asked for Maritza or Irma Reyes, Marvin's mother.  Marvin asked the man what he wanted.  The man took Marvin by the arm and asked him to step outside where a four-door, burgundy colored Honda was double parked near the curb.[1] There were two more men at the car, either inside, or one in the driver's seat and one standing near the rear passenger door.  Afraid, Marvin shouted to his wife, "go inside Maritza.  They are going to kill you."  The man, whom Marvin later identified as Partida, had a gun in his waistband.  He grabbed Marvin by the sweater, said he "wasn't playing around" and pushed him into the car, which then drove off. Marvin also testified that Partida was the man who had asked for Maritza, and whose neck bore the tattoo "Watts up."

At trial, Petrona identified Partida as the man who stood by the door.  Earlier, she identified Partida in a photographic display ("six-pack") as the man who walked into the salon.

At first, Maritza could not identify anyone in court as being among the four men who participated in Marvin's abduction.  Eventually she testified that Partida looked familiar to her even though he had hair by the time of trial.  She then identified Partida as the man who stood by

---

[1]  At one point, Marvin told deputies of the Los Angeles Sheriff's Department (LASD) he complied voluntarily with a request to go outside and did not mention the man had taken his arm.

the door.  At trial, after Partida was ordered to display the "Watts up" tattoo on his neck, Maritza testified both men must have had the same tattoo.  About a month after the incident, Maritza identified Partida as the man who came into the salon and grabbed Marvin.

At trial, Marvin identified [Petitioner] as the man who stood by the door.[2]  He testified that [Petitioner] both rode in the back seat of the car with him and in the front passenger seat, which is also what he had told the police. At trial, Marvin identified both Partida and a third man as the driver of the car.  Marvin also testified that Partida sat next to him in the back of the car.  Partida hit Marvin on the back of the head with a gun and told him to duck down.  Partida took Marvin's cell phone and wallet, which contained, among other things, a paycheck and some credit cards.

After the car drove off, Maritza called 911.  She also called Marvin's mother and told her "some cholos" had taken her son.  Irma quickly came to the salon.  LASD Detective Felicia Lopez arrived at about 5:00 p.m., and hooked up a device to record calls to the salon's phone line.

Marvin was taken to an abandoned house with graffiti on the walls.  Two more men (neither of whom was [Petitioner])

---

[2]  In a meeting with police the day after the incident, Marvin identified someone other than [Petitioner] from a six-pack as the man at the door, and said that man was six-feet tall and over 200 pounds, which is an inaccurate description of [Petitioner].  At the preliminary hearing Marvin explained he mistakenly identified [Petitioner] as the driver of the Honda.

4

arrived at the house.[3]   Partida gave a gun to a man wearing a mask and told him to guard Marvin.   Partida bound Marvin's wrists together with tape, and told him to sit in a corner. Partida had Marvin use his cell phone to call his mother. He told Marvin to tell Irma his captors were not stupid, that they wanted the money and drugs and that it would be the last day of his life if they did not get them.   Marvin called Irma and said "Mommy, they want the stuff."   Partida took Marvin's phone away from him and went into another room.

At the abandoned house, Partida gave Marvin food and beer to calm his nerves.   Marvin was afraid it would be the last day of his life.   At one point, Partida grabbed a can that may have contained gasoline and threatened to burn Marvin alive so he understood "that they were serious." About 6:00 p.m., Partida put Marvin into a different car. Partida got into the back seat with Marvin, guarding him. Three other people were in the car, none of whom was [Petitioner].   Marvin was told to duck down and did not see where they went.

When they arrived at the new destination, Marvin's hands and feet were tied with duct tape and something was put in his mouth.   The driver told Marvin it would be the last day of his life if his mother did not give them the money and drugs.   Marvin was then put in the trunk of an old

---

[3]   A young woman came to the house at one point and had sex with Marvin's captors.   They laughed and had a party.

Buick with gray primer parked in a residential driveway. Black electrical tape was wrapped around his head and mouth. Marvin did not hear anything from inside the trunk. He found something metal, cut his hands and feet free, and pushed into the car's interior. Marvin escaped about 2:00 a.m. He ran until he found a police station. When Marvin got to the police station he had electrical tape around his neck. Later, Marvin identified a residence on East 41st Street as the location where he was placed in the Buick's trunk. He spent about eight hours in the trunk of the car before he escaped.

*The recorded calls and ransom demands*

Maritza and Irma received several calls about Marvin on the salon's line and on their cell phones. No cell phone calls were recorded. Lopez believed some of the calls involved drugs.[4] During one call a male told Maritza, "Old hag. Son of a bitch, I want $280,000." Marvin called Irma three times. In one call, made by Marvin to Irma, he said "Mommy I'm fine. They want the stuff." In another call, someone asked for "crystal" and/or "cocoa." On another

---

[4]   In one recorded call, an unknown male caller told Irma, "I have been giving you a hell of a lot of time, I already gave you two fucking hours...." Irma said she was trying to get the money. The man told her, "I want crystal coke, ... and I don't want just little shit." Irma said, "I am not going to get that for you but the money, I am going to take it to you...." The man said he would give Irma one hour. Subsequent phone calls were made to Irma's cell phone. In one (or more) unrecorded call, Marvin told Irma the suspects wanted "20 to 30 kilos," or "50 kilos." In another call, the suspect said he would accept $10,000 until the rest of the money was available.

call, which Lopez did not hear and which was not recorded, the caller demanded 20 to 30 kilos.  At trial, Lopez said it was highly unusual for someone to ask for that amount of drugs from a random family, and she had doubts about Irma's denial when asked about drug activity.  Lopez did not trace the calls demanding drugs, and did not personally investigate Irma or her family for drug activity because she was not part of the drug crimes unit.[5]

*Drop-off and surveillance*

Later that evening, pursuant to an arrangement with Marvin's captors, Maritza, Irma, and Lopez (acting undercover) drove to a McDonald's at 108th and Central with $10,000 wrapped in a plastic bag.[6]  They parked in the lot, and a blue Nissan pickup truck with some lumber and other debris from construction work in the truck bed soon pulled up near them.  Two men were in the cab of the truck.  At trial, Lopez identified [Petitioner] as the driver.[7]  The passenger got out, took the money from Irma and said Marvin would be calling her.  He told her Marvin would be killed if

_____

[5]   Marvin testified that his mother was convicted of selling controlled substances in December 2008.  He claimed he never saw Irma deal drugs and did not know she sold drugs before her arrest in 2008.

[6]   Lopez and another deputy sheriff, Marcelo Quintero, accompanied Irma to her house where one of her sons took $10,000 from a bundle of $33,000.  The money was used to "buy time"

[7]   Lopez later also identified [Petitioner] in a six-pack photographic display as the driver of the blue pickup truck.

7

they called the police.  The truck drove off and the women followed it for a short distance.

Lopez and another undercover deputy near the scene of the drop-off radioed a description of the truck and its license number.  A team of undercover officers and a helicopter followed the erratic path travelled by the truck as it made its way to Orange County.  Police did not stop the truck because Marvin remained captive.  Eventually, the truck stopped at a residence in Anaheim.  At trial, detective Richard Alvarado, one of the officers involved in the surveillance team following the truck, identified [Petitioner] as the driver of the truck.  In May 2005, Alvarado picked [Petitioner] out of a six-pack as the driver of the truck.  At the time Alvarado saw the truck only [Petitioner] was inside.  It is not known when or where his passenger was dropped off.

[Petitioner]'s stepfather and girlfriend are the registered owners of the pickup truck.  [Petitioner]'s stepfather testified that [Petitioner] has a construction business, and he uses the truck for his work. [Petitioner]'s mother and his girlfriend co-own the four-door red Honda that Marvin identified as the car in which he was driven away from the salon.  [Petitioner] and his girlfriend were the primary users of the Honda.

*Post-incident identifications and investigation*

After the incident, police showed Marvin several six-packs.  Marvin identified Partida in one six-pack, and [Petitioner] in another.  Initially, Marvin identified

8

[Petitioner] as the man who drove the car from the salon. But, at the preliminary hearing, Marvin explained he was mistaken and said [Petitioner] was the man who stayed by the salon door. Marvin identified [Ralph] Montanez in a third six-pack, and said Montanez came to the abandoned house and drove him to the location where he was put into the trunk of a car. Marvin also told the police (mistakenly) that Montanez was at the salon.

On March 24, 2005, Detective Wayne Holston went to an abandoned house on Anzac Avenue in Watts based on information relayed to him by another officer. Marvin identified the house as the one where he had been held captive. There was trash on the lawns and inside the house and graffiti on the walls. Inside the house were some beer bottles, food wrappers, duct tape, a cigarette butt and a chair. Graffiti on one inside wall said "Gato." The cigarette butt was recovered and booked into evidence. Subsequent scientific testing showed that DNA on the cigarette butt matched Partida's DNA. When they followed the blue pickup after it left the lot at McDonald's, officers saw the truck drive near the abandoned house on Anzac Avenue where Marvin was held captive and also drive past the house on East 41st Street where he had been left in the trunk of a car.

*Credit cards*

In 2005, Sandra Serrato was convicted of grand theft for fraudulent use of a credit card. At the time of her arrest, police found credit cards in Serrato's possession

9

that did not belong to her.  Serrato said she got the credit cards from different people.  Serrato knew Partida as "Gato."  At trial, Serrato testified she did not recall getting any credit cards from Partida and denied having told the police she received credit cards from him.  She also denied telling the police Partida obtained the credit cards during a robbery.  Serrato testified she was unable to remember things because the events had occurred years earlier when she had been under the influence of drugs.

In April 2005, Gisela Moreno was living with Sandra Serrato when police found some credit cards at their residence and arrested them.  A[t] some point before that, Moreno and Serrato went to the house of their friend Mona Montanez.  Partida, whom Moreno also knew as "Gato," was at Mona's house with Mona's brother.  Serrato did not have the credit cards when she went to Mona's house, but she had them when she left.  Detective Holston was one of the officers who searched Serrato and Moreno's residence on April 28, 2005.  He recovered a number of credit cards and bank cards in the name of Marvin Reyes.  Serrato told Holston she got the credit cards from Partida on March 24, 2005.

*The Defense*

Partida did not present a defense case.  The only evidence offered by [Petitioner] related to Marvin's photographic identification of Montanez as one of the men who had been at the salon.

(Lodgment No. 8, Appellate Court Decision at 2-8.)

III.

STANDARD OF REVIEW

The standard of review in this case is set forth in 28 U.S.C. § 2254:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim--
>
> (1)  resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States; or
>
> (2)  resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts Supreme Court case law or if it reaches a conclusion different from the Supreme Court's in a case that involves facts that are materially indistinguishable. *Premo v. Moore*, 131 S. Ct. 733, 743 (2011) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  To establish that a state court unreasonably applied federal law, a petitioner must show that the state court's application of Supreme Court precedent to the facts of his case was not only incorrect but objectively unreasonable.  *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010).  Where no decision of the Supreme Court has squarely decided an issue, a state court's adjudication of that issue

11

cannot be contrary to, or an unreasonable application of, clearly established federal law. *See Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

Petitioner raised the claims now before the Court in his petition for review in the California Supreme Court, but that court did not explain its reason for denying them. The appellate court, however, did. (Lodgment No. 8). This Court presumes that the state supreme court denied Petitioner's claims for the same reasons the state appellate court did and will not disturb that decision unless it concludes that "fairminded jurists" would all agree that the state court's decision was wrong. *Richter,* 131 S. Ct. at 786.

IV.

DISCUSSION

A.   <u>Failure to Sever Trial</u>

In Ground One Petitioner claims that the trial court erred by denying his motion to sever his trial from co-defendant Partida's trial. (Petition at 5.) He argues that severance was warranted because the evidence was much stronger against Partida and because, by not severing the trials, Petitioner was prevented from calling Partida to testify at his trial. (Petition at 12-21.) There is no merit to this claim.

Generally, there is a preference for joint trials of defendants who are indicted together, unless they are relying on "mutually antagonistic" or "irreconcilable" defenses that are so prejudicial as to mandate severance. *See Zafiro v. United States*, 506 U.S. 534, 538 (1993). As a consequence, severance should be granted only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making

a reliable judgment about guilt or innocence." *Id*. at 539.   To succeed in a federal habeas corpus petition on the ground that the state court erred in refusing to sever a defendant's trial from a co-defendant's trial, a defendant "bears the burden of demonstrating that the state court's denial of his severance motion rendered his trial fundamentally unfair." *Grisby v. Blodgett*, 130 F.3d 365, 369 (9th Cir. 1997) (internal quotation marks omitted); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991).   A defendant must also show that a joint trial had a "substantial and injurious effect or influence in determining the jury's verdict" to merit habeas relief. *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000); *Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir. 1998).

In denying Petitioner's claim, the California Court of Appeal held that the trial court had not erred when it denied Petitioner's motion to sever his trial from co-defendant Partida's:

> *a. Pretrial Proceedings*
>
> Before trial, [Petitioner] moved to sever his trial from Partida's.  [Petitioner] argued that Partida could offer testimony to exonerate him if they had separate trials.  The exonerating testimony was based on alleged statements Partida made in an "off the record" police interview on August 8, 2005.  An LASD report of that interview was attached to the prosecution's opposition to the motion.
>
> During that interview, conducted in the presence of his trial attorney, Partida denied involvement in the kidnapping.  He told detectives that on the day of the incident he drank a lot of beer and went to the abandoned

house on Anzac Avenue where he and his friends sometimes
partied.  When he arrived, there were several Hispanic men
at the house, some of whom he did not know.  He stayed for
90 minutes drinking beer and left with his girlfriend.
While he was at the house, he saw a Hispanic male sitting on
the floor; his hands and feet were bound with duct tape.
The man appeared relaxed and he seemed to be enjoying
himself.  Partida said two brothers who worked for Irma were
responsible for the kidnapping.  Partida identified Montanez
(his brother-in-law) from a photograph.  Partida also viewed
a photograph of [Petitioner]; he said he had seen him around
but did not know his name.  According to [Petitioner]'s
counsel, Partida's attorney told him Partida would testify
that he was at the abandoned house but that [Petitioner] was
not there, and that Partida first saw [Petitioner] at the
arraignment in this case.[8]

At a hearing on the severance motion, which was
combined with a hearing on other issues, Soop testified
about the interview of Partida.  He said Partida never told
the detectives [Petitioner] was not involved in the
kidnapping.  Partida's attorney was asked whether Partida

---

[8]  At a hearing on another matter in June 2007, [Petitioner]'s
counsel informed the trial court he had just learned from Partida's
attorney that Partida told LASD Detective Michael Soop that
[Petitioner] was not present and he did not know who [Petitioner] was.
During that hearing Partida agreed to disclosure of the interview and
told the trial court "Yes.  I told [the detective] I didn't know these
guys."  Soop was ordered to make a report of the interview.  His
report accompanied [Petitioner]'s motion to sever.

14

would testify on [Petitioner]'s behalf if separate trials were ordered.  This exchange followed:

"**The Court**: [to Partida's attorney] ... As counsel, ... are you prepared to and is Mr. Partida prepared to assure the court and counsel that Mr. Partida will testify unconditionally at the end of any trial that he has by himself first regardless of the outcome in that trial?

"**[Partida's attorney]**: No, Your Honor.

"**The Court**: And if there should be a hung jury in this case, or if there is a conviction in that case, can you assure the court and counsel that your client would testify in the second trial?

"**[Partida's attorney]**: If it is a hung jury, definitely not.  In the event of conviction, until his appellate rights are exhausted, I don't think--right now, from what I'm hearing, he is reluctant.  So I don't think I can make that assurance to the court."

The severance motion was denied.

   *b. Legal standard*

"'There is a statutory preference for joint trial of jointly charged defendants.  ([Cal. Pen. Code] § 1098.)  "A 'classic' case for joint trial is presented when defendants are charged with common crimes involving common events and victims."' [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 725-726.)  We review a ruling on a motion for separate trials for abuse of discretion (*id.* at p. 726), confining our review to facts presented to the trial court in connection with the motion.  (*People v. Price* (1991) 1

15

Cal.4th 324, 388.)  "'Under Penal Code section 1098, a trial court *must* order a joint trial as the "rule" and may order separate trials only as an "exception."' [Citation.]" (*Cleveland*, at p. 726.)

In denying the motion to sever the trial court applied the six factors listed in *People v. Isenor* (1971) 17 Cal.App.3d 324 (*Isenor*), to be considered in determining whether to sever based on the claim that a codefendant will offer exonerating testimony.  Those factors are: "(1) Does the movant desire the testimony of the codefendant; (2) will the testimony be exculpatory; (3) how significant is the testimony; (4) is the court satisfied that the testimony itself is bona fide; (5) on the basis of the showing at the time of the motion, how strong is the likelihood that, if the motion were granted, the codefendant will testify; and (6) what is the effect of the granting in terms of judicial administration and economy?"  (*Id*. at p. 332.)

Here, apart from the first factor, the court found the *Isenor* factors weighed against severance.  As for the first factor, it was clear [Petitioner] desired Partida's testimony.

With respect to the second factor, the court was not convinced Partida's testimony would be exculpatory.  In the interview Partida denied any involvement in the kidnapping, but he never indicated whether he knew [Petitioner] was involved, let alone that he knew he was not.  Nor was Partida's statement that he did not know [Petitioner] exculpatory.  If Partida admitted having been involved in

16

the kidnapping, and also said he did not know [Petitioner],

his statement may have been exculpatory since Partida

presumably would know the people with whom he committed the

crime.  But Partida denied involvement in the crime.

Logically, it does not follow that because Partida did not

know who [Petitioner] was [Petitioner] could not have been

involved in the crime.  [Petitioner] also maintains that the

fact that Partida did not identify [Petitioner] as one of

the men at the abandoned house was exculpatory.  But

[Petitioner] could have participated in the crime without

going to that house.  Indeed, Marvin never claimed

[Petitioner] was at the abandoned house.  Rather,

[Petitioner]'s involvement stems from his presence at the

salon when Marvin was abducted, and having driven the truck

used to collect the ransom money.  The court was correct

that the answer to the question of whether [Petitioner]'s

testimony in another trial would in fact exculpate Partida

was, at best, "unknown."

     Third, the court also found that whether the expected

testimony was significant was "not all that clear."  If a

jury in a separate trial believed Partida was not involved

in the crime, then Partida's testimony that he did not know

[Petitioner] could help [Petitioner] by negative implica-

tion.  On the other hand, for the reasons discussed above,

the testimony still may not have been of significant use to

[Petitioner] even if the jury found it credible.  And, if

the jury disbelieved Partida's claims regarding his lack of

involvement in the kidnapping, it might also have disbelieved his claim that he did not know [Petitioner].

On the fourth factor, the trial court had significant doubts whether Partida's testimony would be "bona fide" since his denial of involvement in the crime was self-serving and contradicted by compelling evidence that he was one of the perpetrators. The court had serious concern with "credibility issues about whether ... Partida [was] being all that forthcoming and all that complete."

It was the fifth factor--the question of how strong the likelihood was, if the motion was granted, [Petitioner] really would testify--which caused the court the "greatest concern." At the hearing on the motion, Partida's counsel told the court Partida was, at best, reluctant to testify in a separate trial. He also said his client would "definitely not" testify if his separate trial ended in a hung jury, nor did he believe Partida would agree to testify until his "appellate rights" were exhausted.

Partida's counsel was clearly and appropriately looking out for his client's interests. Any testimony by Partida at a separate trial could potentially be used against him in the event of a retrial or in a proceeding challenging his conviction. The court noted that "sword of Damocles" would remain hanging over Partida's head until the case was final, which could take years. In addition, [Petitioner]'s severance motion was premised on Partida's case proceeding to trial first. But there was no guarantee the two trials would proceed in that fashion, and neither defendant "had

18

[the] right to dictate the scheduling of trials to their advantage." (*People v. Conerly* (2009) 176 Cal.App.4th 240, 251.) In the end, the court concluded there was "no reasonable probability [Partida] would give testimony even if granted severance," and "as far as [the court is] concerned, element no. 5 is a factor which overwhelmingly indicates that severance should not be granted in this case." That conclusion was not inappropriate. "The absence of substantial proof that a codefendant would be willing to testify for the defendant at a later date is, in itself, grounds for denying a motion for severance. [Citations.]" (*Isenor*, supra, 17 Cal.App.3d at p. 334.)

The sixth factor addresses the impact of severance on judicial administration. Here the court was concerned about avoiding trauma to Marvin and his family members if they were forced to testify about the kidnapping in two trials, as well as the "duplication of resources" that would result from two lengthy trials, weighed against its determination that there was "any kind of real basis for believing that we are going to get anywhere with" severance.

On this record, we find the denial of the severance motion was not an abuse of discretion. The trial court carefully considered the *Isenor* factors in exercising its discretion, and properly found [Petitioner] made an insufficient showing that Partida would give exonerating testimony on his behalf if the court granted his motion. (*See People v. Conerly, supra*, 176 Cal.App.4th at pp.

19

1    250-253 [applying *Isenor* factors and finding that trial

2    court did not abuse its discretion in denying severance].)

3  (Lodgment No. 8 at 9-13.)

4        This Court agrees with the state court's findings.  The only way

5  Partida was going to testify for Petitioner was if Partida went to

6  trial first and was acquitted.  Otherwise, Partida was not going to

7  testify on Petitioner's behalf.  Further, contrary to Petitioner's

8  arguments here, Partida's testimony was at best marginally helpful and

9  at worst hurtful.  His claim that he was not involved in the

10  kidnapping in the face of the overwhelming evidence that he was,

11  including the witnesses who identified him by his "Watts up" tattoo on

12  his neck, was absurd.  Any prosecutor would have been able to shred

13  Partida's testimony to bits, allowing the jury to see right through

14  it.  Partida's claim that he saw the kidnap victim sitting on the

15  floor of the abandoned house with duct tape binding his wrists and

16  ankles but "appeared relaxed and [] seemed to be enjoying himself" is

17  almost comical.  Confronted with the absurdity of this testimony, it

18  is highly unlikely that Partida's testimony that he was not involved,

19  that he did not know Petitioner, and that Petitioner was not at the

20  abandoned house with the victim would have helped Petitioner's chances

21  of avoiding responsibility for the kidnapping because Petitioner's

22  case would have been tied to this unbelievable testimony.

23        Petitioner also contends that severance was mandated because the

24  evidence against Partida was so much stronger than the evidence

25  against Petitioner and, therefore, he was unfairly prejudiced by being

26  tried with Partida.  The Court addresses the sufficiency of the

27  evidence against Petitioner below.  Suffice it to say, however, that

28  the Court finds that the evidence against Petitioner was much stronger

than Petitioner suggests.  For these reasons, the Court concludes that Petitioner's rights were not violated when he was tried alongside Partida.  *See United States v. Smith*, 893 F.2d 1573, 1581 (9th Cir. 1990) (upholding denial of severance motion where joint trial of co-defendants resulted in no "specific and compelling prejudice").[9]

B.   Insufficient Evidence

In Ground Two, Petitioner claims that there was insufficient evidence to convict him of kidnapping because there was no evidence that he knew about the kidnapping or had the specific intent to kidnap the victim for ransom.  (Supreme Court Brief attached to Petition at 23.)  There is no merit to this claim.

The United States Supreme Court established in *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), that federal habeas corpus relief is not available to a petitioner who claims that the evidence was insufficient to support his conviction unless he can show that, considering the trial record in a light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  In evaluating such claims, the Court must presume, even if it does not affirmatively appear in the record, that the jury resolved any conflicting inferences in favor of the prosecution.  *Wright v. West*, 505 U.S. 277, 296-97 (1992); *Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000).  Further, the Court reviews the state court's decision "with an additional layer of deference," granting relief only when the state court's judgment was

---

[9]  The Court also notes that Defendants' defenses were not mutually inconsistent or antagonistic to each other.  Rather, they were identical, both claiming that they did not kidnap the victim.

contrary to or an unreasonable application of *Jackson*.   *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

In applying the *Jackson* standard, the Court looks to state law to determine what evidence is needed to support a conviction on the crime charged.   *Jackson*, 443 U.S. at 324 n.16.   In California, a person commits kidnapping for ransom if they kidnap someone for ransom or reward.   Cal. Pen. Code § 209(a).

The California Court of Appeal denied this claim as follows:

> [Petitioner] argues there is insufficient evidence to sustain his conviction for kidnapping for ransom because there was conflicting and non-credible evidence as to whether he was present at the salon when Marvin was abducted, speculative evidence that the car used to transport Marvin from the salon was registered to members of his family, no evidence he had any connection to anyone involved in the kidnapping and, even though he was identified as the driver of the pickup in which his passenger collected a bag filled with $10,000, no evidence he knew about the ransom demand or the contents of the bag. We cannot agree.
>
> First, Marvin identified [Petitioner] at trial as one of the men present at the salon when he was abducted; he was the one who stood by the door.   Marvin also testified that [Petitioner] was one of the men in the car that took him away, though his testimony varied as to whether [Petitioner] was in the front or rear passenger seat.[10]   Even if neither

---

[10]   At one point during cross-examination, [Petitioner]'s counsel pressed Marvin about contradictions in his story regarding whether

22

1   Maritza or Petrona was able to place [Petitioner] at the
2   salon, Marvin's identification was sufficient evidence to
3   permit the jury to determine that [Petitioner] was one of
4   the perpetrators.  (*See People v. Young* (2005) 34 Cal.4th
5   1149, 1181 [absent physical impossibility or inherent
6   improbability, the testimony of one witness may support a
7   conviction].)   In addition, two LASD detectives identified
8   [Petitioner] as the driver of the pickup truck that came to
9   the McDonald's lot to collect the ransom money.   Given
10   evidence that [Petitioner] both participated in Marvin's
11   abduction and later drove to a designated location to
12   collect the ransom money (both times using cars registered
13   to his family members), the jury could reasonably infer he
14   was a participant in Marvin's kidnapping, knew the nature of
15   the crime, and committed the crime with the specific intent
16   to obtain a ransom.  (*See People v. Campbell* (1994) 25
17   Cal.App.4th 402, 409 [defendant's presence at the crime
18   scene, and his companionship and conduct before and after
19   the offense are relevant to determining whether he is aider
20   and abettor] .)

21   (Lodgment No. 8 at 13-15.)

22       Again, this Court agrees.  Though the victim's testimony was not
23   always consistent and though some of the witnesses' memories faltered,

24   _____

25   [Petitioner] had been in the front or rear passenger seats, or even in
    the Honda at all.   Apparently flustered, Marvin responded that
26   [Petitioner] "wasn't in the car."  Apart from this instance, Marvin's
    testimony did not vary with respect to his claim that [Petitioner] had
27   been physically present in the car—registered to [Petitioner]'s mother
    and girlfriend—that whisked him away from the salon.
28

viewing this evidence and the inferences to be drawn from it in a light most favorable to the prosecution, there was more than enough evidence to establish that Petitioner knowingly participated in the victim's abduction with the specific intent to obtain ransom.  This evidence included the fact that he went to the salon, abducted the victim, drove him away from the salon in his car, and later drove to the agreed upon meeting spot in his truck to pick up the ransom money. For these reasons, this claim is denied.[11]

C.   The Trial Court's Failure to Give a Lesser Included Instruction for False Imprisonment

In Ground Three, Petitioner contends that the trial court should have given a false imprisonment jury instruction because the evidence was weak and inconsistent as to his role in the kidnapping.  There is no merit to this contention.

Generally speaking, a state trial court's decision not to instruct on a lesser included offense is a question of state law and, therefore, does not involve a federal constitutional question. *See Solis v. Garcia*, 219 F.3d 922, 929 and n.7 (9th Cir. 2000).  As a result, it is not cognizable here. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").  Further, because the Supreme Court has never held that a state court is required to instruct on a lesser included offense in a noncapital case, *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995) ("There is no settled rule of law on whether *Beck* [*v. Alabama*,

---

[11]   The Court recognizes that the car and truck used in the kidnapping were registered to family members, but it is clear that they were being used by Petitioner as his own.

447 U.S. 625 (1980)] applies to non-capital cases[.]"), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (en banc), the Court of Appeal's rejection of this claim could not constitute an unreasonable application of Supreme Court law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from [the United States Supreme] Court regarding [petitioner's claim], it cannot be said that the state court unreasonably applied clearly established Federal law." (internal quotation marks omitted)).

Were the Court to reach the merits, it would conclude that the state court's denial of this claim was reasonable. As that court explained:

> [Petitioner] joins Partida's assertion that the trial court should have instructed on false imprisonment. He contends that as to him, the evidence was "weak and inconsistent" as to whether he was involved in the asportation of Marvin from the salon to the house, and there was no evidence he was involved in transporting Marvin from the abandoned house to any other location. We again note that defendants were convicted of kidnapping for ransom, an offense which does not require asportation. Moreover, [Petitioner] fails to describe any scenario supported by the evidentiary record under which the jury could have found him guilty only of false imprisonment. We also disagree with [Petitioner]'s assertion that the evidence he was involved in Marvin's abduction from the salon was weak. Marvin consistently identified [Petitioner] as one of the men in the car that transported him from the salon to the abandoned

1  house.  [Petitioner] was either guilty of the kidnapping for
2  ransom as an aider and abettor or he was not guilty at all.
3  (Lodgment No. 8 at 18-19.)

4      Although the Ninth Circuit has suggested that a trial court's
5  refusal to instruct a jury on a lesser included offense that is
6  consistent with the defendant's theory of the case may constitute a
7  cognizable habeas claim, *see Solis*, 219 F.3d at 929 (citing *Bashor v.*
8  *Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)), the instruction in
9  question was not consistent with Petitioner's defense.  Petitioner's
10 defense was that this was a case of mistaken identity.  (Reporter's
11 Transcript ("RT") 2229-53.)  Alternatively, he argued that there was
12 no evidence tying him to the co-defendant or proving that Petitioner
13 knew that the kidnapping was for ransom.  (RT 2229-53.)  He never
14 argued to the jury that he was present at the crime and was merely
15 guilty of falsely imprisoning the victim.

16     Because an instruction on false imprisonment was inconsistent
17 with Petitioner's theory of the case, the trial court's failure to
18 instruct on it was not fundamentally unfair and did not result in a
19 deprivation of Petitioner's constitutional rights.  *See Bashor*, 730
20 F.2d at 1240.

21     Finally, even assuming that a false imprisonment instruction
22 should have been given, the failure to do so did not have a
23 substantial or injurious effect or influence on the jury's verdict.
24 *See California v. Roy*, 519 U.S. 2, 5-6 (1996) (applying harmless error
25 standard enunciated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38
26 (1993), to claim of instructional error).  The evidence of
27 Petitioner's guilt was strong in this case.  Nothing presented here

28

26

suggests to the Court that the outcome would have been different had the trial court instructed the jury on false imprisonment.

V.

CONCLUSION

For the foregoing reasons, the California courts' denial of Petitioner's claims was neither contrary to nor an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts.   28 U.S.C. § 2254(d). Accordingly, the Petition is denied and the action dismissed with prejudice.   The Court further finds that Petitioner is not entitled to a certificate of appealability.   *See* Rule 11, Federal Rules Governing Section 2254 Cases ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

IT IS SO ORDERED.

DATED:   June 27, 2013.

_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-State Habeas\PLASCENCIA, J 8102\MEMORANDUM OPINION AND ORDER.WPD